

IN THE
TENTH COURT OF APPEALS

No. 10-13-00233-CR

EX PARTE JOHN RAY FALK, JR.

From the 272nd District Court
Brazos County, Texas
Trial Court No. 13-001409-CV-272

## O P I N I O N

John Ray Falk, Jr., asserting five issues, appeals the trial court's denial of relief on

his pretrial application for writ of habeas corpus and plea in bar brought to avoid retrial

for capital murder. We will affirm.

### Background

Falk is under indictment and awaiting retrial for the prison-escape-related capital

murder of Susan Canfield, a correctional officer. The factual background of the alleged

offense is set forth in our and the Court of Criminal Appeals' mandamus opinions. *In re*

*State ex rel. Weeks*, 392 S.W.3d 280, 283 (Tex. App.—Waco 2012, orig. proceeding) (*Weeks*

*I*); *In re State ex rel. Weeks,* 391 S.W.3d 117, 119-20 (Tex. Crim. App. 2013) (orig.

proceeding) (*Weeks II*).

On December 3, 2012, the State sought a stay of Falk's first trial at the jury-charge portion of the trial's guilt-innocence phase, and on December 4, we ordered a stay of the trial. *Weeks I,* 392 S.W.3d at 283. On December 12, in an opinion ultimately denying mandamus relief for the State, we addressed the State's complaints about the trial judge's proposed charge. *Id.* at 287, 289. The State then sought mandamus relief on the charge issues in the Court of Criminal Appeals, which conditionally granted relief and ordered us to grant mandamus relief for the State in an opinion dated January 16, 2013. *Weeks II,* 391 S.W.3d at 126. We complied by issuing a January 18 order. *In re State ex rel. Weeks,* 392 S.W.3d 339 (Tex. App.—Waco 2012, orig. proceeding) (order) (*Weeks III*).

On January 28, fifty-five days after our stay, the trial judge reconvened the jury and *sua sponte* ordered a mistrial on the ground of manifest necessity. The trial judge read his prepared and signed order to the jury and then expressed to the jury his personal views about some aspects of the case. After he finished his comments and reiterated the mistrial, the State objected to the mistrial and suggested that the trial judge recuse himself. Falk did not object to the mistrial[1] or make any response to the trial judge's actions.

The trial judge subsequently recused himself, and the Honorable John Delaney was assigned to preside over the case. Falk then filed his habeas application to bar retrial. He alleged two Double Jeopardy grounds: (1) the *sua sponte* mistrial was ordered without manifest necessity; and (2) the original trial judge's decision that

---

[1] Just before the trial judge brought the jury in, Falk had argued for a directed verdict and had also stated: "Furthermore, we believe that the State's attorney has done things in this case to goad us into a mistrial that we do not want."

insufficient evidence existed to warrant the submission of a law-of-parties instruction was an acquittal. Falk also alleged that the two mandamus proceedings initiated by the State violated Falk's due-process rights and that the exercise of mandamus jurisdiction by the Court of Criminal Appeals violated the separation of powers of the Texas Constitution and also violated state and federal guarantees of due process, equal protection, and open courts. The habeas trial court denied Falk's request for habeas relief, and this appeal followed.

## Standard of Review

> We review the trial court's denial of a habeas corpus application for an abuse of discretion. *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006). … We review "the record evidence in the light most favorable to the trial court's ruling and [we] must uphold that ruling absent an abuse of discretion." *Id.*

*Ex parte Rodriguez,* 378 S.W.3d 486, 489 (Tex. App.—San Antonio 2012, pet. ref'd); *see also*

*Ex parte Graves,* 271 S.W.3d 801, 803 (Tex. App.—Waco 2008, pet. ref'd), *cert. denied,* 130

S.Ct. 261 (2009).

> [I]n reviewing the trial judge's decision to grant or deny double jeopardy relief by way of habeas corpus, the standard of review is not static and it must vary depending on the cause of the mistrial. *See Arizona v. Washington,* 434 U.S. 497, 507-508, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); *Cherry v. Dir., State Bd. of Corr.,* 635 F.2d 414, 418-19 n.6 (5th Cir. 1981) (recognizing that the standard of review can vary from the "highest degree of respect" to the "strictest scrutiny" depending on the reason for the mistrial). At one end of the spectrum, broad deference is appropriate because the trial judge is in the best position to assess the relevant considerations. *Washington,* 434 U.S. at 513-14, 98 S.Ct. 824 (broad discretion appropriate where mistrial necessitated by a need to prevent jury-bias); *Ex parte McMillian,* No. 05-11-00642-CR, 2011 WL 3795727, at *2-3, 2011 Tex. App. LEXIS 6912, at *6 (Tex. App.—Dallas Aug. 29, 2011, pet. ref'd) (broad discretion appropriate where mistrial involved potentially deadlocked jury). At the other end of the spectrum, strict scrutiny is

appropriate when the basis of the mistrial is the unavailability of critical prosecution evidence. *Washington,* 434 U.S. at 508, 98 S.Ct. 824. Therefore, part of our task is to determine the correct standard of review by identifying the cause of the mistrial. *United States v. Fisher,* 624 F.3d 713, 719 (5th Cir. 2010).

*Ex parte Rodriguez,* 366 S.W.3d 291, 296 (Tex. App. — Amarillo 2012, pet. ref'd).

## Findings and Conclusions

We begin with Falk's fifth issue, which argues that the habeas trial court committed reversible error by refusing to make requested findings of fact and conclusions of law on the denial of Falk's habeas application. Before submission, Falk made the same argument by motion, which we denied.

While a trial court's findings and conclusions are helpful in a habeas proceeding, they are "not legally required." *Ex parte Peterson,* 117 S.W.3d 804, 818 (Tex. Crim. App. 2003), *overruled on other grounds by Ex parte Lewis,* 219 S.W.3d 335, 371 (Tex. Crim. App. 2007). Because no error was committed, we overrule issue five.

## Manifest Necessity

In his first issue, Falk contends that manifest necessity did not exist to allow the *sua sponte* mistrial and that he did not give implied consent to the mistrial.

In cases tried before a jury, a defendant is placed in jeopardy when the jury is empaneled and sworn, and "because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendant's 'valued right to have his trial completed by a particular tribunal.'" *Arizona v. Washington*, 434 U.S. 497, 504 (1978) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)); *see Hill*, 90 S.W.3d at 314. Despite the general prohibition against jeopardy-barred trials, there are two exceptions when a criminal defendant may be tried a second time without violating double-jeopardy principles if the prosecution ends prematurely as the result of a mistrial: (1) if the criminal defendant consents to retrial or (2) there was a manifest necessity to grant a mistrial. *Ex parte Garza*, 337

S.W.3d 903, 909 (Tex. Crim. App. 2011); *see Washington*, 434 U.S. at 505–06. These exceptions are recognized because valid reasons exist for a jury to be discharged before the conclusion of a trial and not all of those reasons "invariably create unfairness to the accused[.]" Thus, a defendant's right to have his trial conducted by a particular tribunal "is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Washington*, 434 U.S. at 505.

To prevail in a double-jeopardy claim, a criminal defendant must first show that he or she is being tried for the same offense for which the mistrial was declared over the defendant's objection. The burden then shifts to the State to demonstrate a "manifest necessity" (also referred to as a "high degree" of necessity) for the mistrial. A trial court's decision to declare a mistrial is limited to the inquiry of if there was a "manifest necessity" to grant a mistrial. *See Garza*, 337 S.W.3d at 909. We have stated that a trial court abuses its discretion if it declares a mistrial "without first considering the availability of less drastic alternatives and reasonably ruling them out[,]" although the basis for the mistrial need not be expressly articulated in the record. *Id.* And the Supreme Court has stated that "the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." *Washington*, 434 U.S. at 511. As an appellate court, it is our function to review the record and determine if the trial judge exercised "sound discretion" when granting a mistrial. *Id.* at 514.

*Pierson v. State,* 426 S.W.3d 763, 769-70 (Tex. Crim. App. 2014).

In evaluating manifest necessity, a reviewing court must consider the nature of the case, its procedural posture, the cause of the mistrial, the interests of the parties, the availability of less drastic alternatives, and the ends of public justice. The classic formulation of the test for manifest necessity was penned by United States Supreme Court Justice Joseph Story in *United States v. Perez*, 22 U.S. 579, 580, 6 L.Ed. 165, 9 Wheat. 579 (1824) as follows:

> [w]e think, that in all cases of this nature, the law has invested Courts of justice with authority to discharge a jury for giving any verdict, whenever, in their opinion, taking all circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a

sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest of caution, under urgent circumstances, and for very plain and obvious causes… . But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

Manifest necessity exists only in very extraordinary and striking circumstances demonstrating a high degree of necessity that the trial come to a premature end. *Washington,* 434 U.S. at 505-06, 98 S.Ct. 824; *Ex parte Fierro,* 79 S.W.3d 54, 56 (Tex. Crim. App. 2002); *Brown v. State,* 907 S.W.2d 835, 839 (Tex. Crim. App. 1995). The circumstances must (1) render it impossible to arrive at a fair verdict before the initial tribunal, (2) render it impossible to continue the trial, or (3) involve trial error that would trigger an automatic reversal on appeal if a verdict was returned. *Ex parte Garza,* 337 S.W.3d at 909.

Manifest necessity is not a standard that can be applied mechanically or without attention to the particular problem confronting the trial court. In reviewing a trial court's determination of manifest necessity, we apply a dynamic abuse of discretion standard depending on the cause of the mistrial. *Fisher,* 624 F.3d at 719. A trial court's decision to declare a mistrial is a matter committed to the trial court's broad discretion and such a decision should be accorded great deference on appeal. *See Washington,* 434 U.S. at 509-10, 98 S.Ct. 824. A trial court abuses its discretion, however, whenever it declares a mistrial without first considering the availability of less drastic alternatives and reasonably ruling them out. *Ex parte Garza,* 337 S.W.3d at 909. The record need not contain the trial court's reasoning for declaring the mistrial so long as the manifest necessity is apparent from the record. *Id.* at 909-10.

*Rodriguez,* 366 S.W.3d at 296-97.

The trial judge's January 28, 2013 mistrial order reads:

A 55 day interruption of this Capital Murder trial by the 10th Court of Appeals and the Court of Criminal Appeals, constitutes a manifest necessity for the declaration of a mistrial. The ends of public justice and justice for the parties cannot be furthered by a continuation of a trial so interrupted. Asking jurors to return a fair and impartial verdict after such a delay in a complicated case such as this, places an unconscionable and

impossible burden on them. The court finds there is no adequate alternative to remedy the delay in the progression of this trial other than the declaration of a mistrial.

Before the granting of the mistrial, the trial court proceedings resumed on Friday, January 25. In addition to both sides' continuing arguments and objections to the charge, the trial judge and the parties addressed Falk's motion for directed verdict, motion in limine, and request to interview jurors.

The trial judge expressed concern over what to tell the jury after the fifty-five-day delay, and with there being twenty-four witnesses, he was also concerned with how well the jury would be able to remember the trial testimony after the lengthy delay. The trial judge was skeptical of the State's proposal of extra time for closing argument so they could spend more time reviewing the trial testimony for the jury to refresh the jurors' memories; at several times during argument on Falk's motion for directed verdict, there was substantial argument and disagreement over the testimony of certain witnesses. Falk noted that extra time "will just turn into a contest of who remembers the facts better." The following colloquy then occurred:

THE COURT: You don't agree on what the witnesses said.

[PROSECUTOR]: My theory, Your Honor, was that if we put a little time in up front it might save a little on the back.

THE COURT: I think argument will be a nightmare. There has been some misquotes from the record already here today. And if you get up there and try to review this in front of the jury and she objects or he objects that is outside the record - -

[PROSECUTOR]: Your Honor, that happens in every closing argument. We disagree on what a witness says.

THE COURT: Yes. But usually it is less than fifty-six days ago.

In the motion in limine, Falk asserted: "If the State of Texas through its prosecutors is allowed to mention this interlocutory appellate process or any alleged action they took against the trial court, Defendant will be harmed and prejudiced thereby."[2] The State did not oppose the motion, and the trial judge stated, "They probably all read about it in the Bryan Eagle by now."

In his motion to interview jurors, Falk asserted that because he was entitled to a fair and impartial jury, the trial judge should interview on the record each juror *in camera* and individually to determine whether the jury had complied with the court's instructions and has not been tainted during the delay. Falk requested that each juror be asked: (1) During the stay of these proceedings have you read, viewed or heard any information about this case? (2) If so, what information have you read, viewed, or heard? (3) Has that information influenced you in any way? and, or (4) Can you follow the court's instructions and only make your decision in this case based solely on evidence entered in the courtroom and hold the state to their burden of proof? The State did not disagree with Falk's request.

In the hearing, Falk argued that these questions could help "determine whether or not this panel can still sit." The trial judge expressed concern about asking the jurors

---

[2] When we stayed proceedings in the trial court on December 4, the trial judge told the jury that the State had occasioned the stay and thus the delay in the trial: "I hate to tell you this but the State has filed an application for a stay of these proceedings. And the Court of Appeals has set an argument on their motion for tomorrow afternoon at 2:00 o'clock. So I have no alternative but to stay these proceedings until the outcome of that. … I do apologize for this … and I do regret that this has happened." In his habeas application, Falk asserted that the jury would thus hold the delay against the State: "Defendant had every reason to believe the delay would be held against the State by the jury as the Trial Judge had informed them at the time of recess that the stay was a result of a State filing."

if they "confess or admit to doing things" that he had ordered them not to do and said that he was reluctant to "have any conversation with a juror;" "I really don't like to do that." He also explained that it puts a judge "in a funny situation when you send him in there to interview jurors by himself." And finally, he suggested that if he did interview the jurors, he should also ask them if "they have enough memory of what was said during this case" to "reach a true verdict."

Plainly, both sides and the trial judge were concerned with potential juror bias occasioned by the delay, and the trial judge was even more concerned about the delay's effect on the jury's ability to recall the trial testimony to be able to return a fair and impartial verdict in a case in which the State was seeking the death penalty. Also, the trial judge considered but ruled out less drastic alternatives such as allowing for longer closing argument and interviewing the jury.

In this extraordinary situation, we give "great deference" to the trial judge. *See Pierson*, 426 S.W.3d at 773 (noting "great deference should be accorded to the ruling of a court granting a mistrial [when it] turned on the trial judge's unique ability to evaluate whether the complained of action biased the jury") (citing *Washington*, 434 U.S. at 512-13).

> **There are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias.** He has seen and heard the jurors during their *voir dire* examination. He is the judge most familiar with the evidence and the background of the case on trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be.

*Id.* at 773-74 (quoting *Washington)* (emphasis added in *Pierson).*

According great deference to the trial judge's determination that the extraordinary and unprecedented fifty-five day delay and the potential for juror bias warranted a mistrial on the basis of manifest necessity, we conclude that the habeas trial court did not abuse its discretion in denying Falk relief on the ground that manifest necessity did not exist. Having so concluded, we need not address Falk's no-implied-consent argument, and we overrule issue one.

## Acquittal or Final Resolution

In issue two, Falk contends that the trial judge acquitted him on the State's section 7.02(a)(2) theory of party liability and that Double Jeopardy thus bars retrial on that theory. *See Weeks I,* 392 S.W.3d at 286-87. After the State rested in Falk's trial, Falk orally moved for a directed verdict on several grounds, during which Falk argued as follows:

> The State is not entitled to a jury charge under the parties theory. They are not entitled to 7.02(a) because there is no evidence that John Falk aided and abetted and solicited and encouraged Jerry Martin to drive the truck into the horse that Susan Canfield was riding. There is no credible evidence that a reasonable juror could believe beyond a reasonable doubt that John Falk did anything to encourage Jerry Martin to make that action that ultimately caused her death.

Before the State responded, the trial judge commented:

> … under 7.02 parties, 7.02(a)(2), I do not see any evidence where he - - this is talking about John Falk, Jr. This is the aiding, abetting part of the driving the vehicle into Canfield or her horse. I don't see any evidence where he solicited, encouraged it, directs it, aids it, or attempts to aid the other person to commit the offense of driving the vehicle into the horse or her. So I don't think you can go under 7.02(a)(2) of the parties statute.

The evidence, as I recall it, particularly from Mr. Isaacs - - and there was another witness who was under the shed, I can't remember his name, but they testified, as I recall, that Mr. Falk had already gotten the rifle and that he was on down the road at the time of the collision of this vehicle and Mrs. Canfield, okay?

Thereafter, the parties argued charge issues on escape and conspiracy, and in the midst of those arguments and despite the trial judge's initial statements, the State interjected further argument on the law of parties:

[PROSECUTOR]: Your Honor, the killing came out of the two of them working together. I mean, we have them going to Jeffcoat together, we have Falk coming behind Jeffcoat pushing him off, Martin getting the gun, Martin - -

THE COURT: They didn't kill Jeffcoat.

[PROSECUTOR]: Martin getting the gun and throwing it to Falk. Then they go through the fence, one after the other. There is some testimony that Falk started in the direction of that building and then turned to meet Officer Canfield. His engagement of Officer Canfield enabled Martin to get to that vehicle. Without him there then Canfield would have had free reign to go to that vehicle. So I think 7.02(a) and (b) both apply because he is working to assist him to get to the vehicle. Without Falk's actions Martin - -

THE COURT: You're ignoring the evidence where he was already away from her. He was walking on down the road.

[PROSECUTOR]: Nobody says he was walking down the road.

THE COURT: Oh, yes, Mr. Isaac did. He was running - -

[PROSECUTOR]: When the truck [*sic*] got hit everybody said it was a bang-bang thing. He gets the gun, comes out with it and moves away from the horse as the horse gets hit. That he was in the immediate area of the horse.

THE COURT: I guess you didn't hear Mr. Isaac and the guy that was in the shed.

[PROSECUTOR]: Mr. Isaac did not see when the horse got hit, if the Court recalls. Mr. Wilson said that he was right there.

[DEFENSE COUNSEL]: No, he didn't. There is one guy that said that and that is it. That was it.

THE COURT: If Mr. Falk was still there at the horse I would like to know why the vehicle didn't hit him. Why did the vehicle not hit Falk.

[PROSECUTOR]: Because he moved out of the way enough, he moved to the side enough that he didn't get hit. Both Grissom and Jeffcoat said he was right there when - -

[DEFENSE COUNSEL]: No, they didn't. Jeffcoat says he is twenty feet away and Mr. Grissom said he couldn't see them, that he wasn't near the horse. He was somewhere behind it, couldn't see it.

[PROSECUTOR]: And he was - - they were struggling together which kept her again from going after Martin and gave him free reign. Any reasonable jury - -

At that point, the trial judge switched topics and again began discussing escape and conspiracy. Without explicitly ruling on Falk's motion for directed verdict on section 7.02(a)(2) party liability, the trial judge then recessed for lunch. Upon reconvening, the trial judge still made no explicit ruling.

After putting on one witness, the defense rested. Falk orally moved for a directed verdict on additional grounds, and the trial judge explicitly denied the motion. After another recess, the trial judged asked for any objections to the proposed charge. The State objected to the lack of inclusion of an instruction under section 7.02(a)(2) and to the proposed application paragraph on conspiracy. The trial judge overruled the State's objections, and the State then informed the trial judge that it was going to seek mandamus relief and an emergency stay.

On the next day, we stayed the trial. After the mandamus proceeding in the Court of Criminal Appeals was concluded, in *Weeks III* we issued an order conditionally granting mandamus relief for the State. *Weeks III,* 392 S.W.3d 339. Thereafter, Falk filed a written motion for directed verdict that, among other things, sought a partial directed verdict on the State's section 7.02(a)(2) party theory of capital murder. In arguing the motion for directed verdict before the trial judge declared the mistrial, Falk argued in part: "And we also request a directed verdict based on the 7.02(a) parties Charge which the Court has already found was insufficient in response to our first request on directed verdict." The following colloquy then occurred:

> [DEFENSE COUNSEL]: Your Honor, can I get a ruling?
>
> THE COURT: Beg your pardon?
>
> [DEFENSE COUNSEL]: Can I get a ruling? I have to have a ruling, Your Honor, on the record.
>
> THE COURT: Okay, denied.
>
> [DEFENSE COUNSEL]: As to all my requests? Did you say to all of them, Your Honor?
>
> THE COURT: Yes. …

Falk contends that the trial judge's initial comments on the evidence pertaining to Falk's criminal responsibility under section 7.02(a)(2) were an acquittal on that theory of party liability. *See* TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011). Falk relies on *Evans v. Michigan*:

> [O]ur cases have defined an acquittal to encompass any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense. Thus an "acquittal" includes "a ruling by the court that the

> evidence is insufficient to convict," a "factual finding [that] necessarily establish[es] the criminal defendant's lack of criminal culpability," and any other "rulin[g] which relate[s] to the ultimate question of guilt or innocence."

*Evans v. Michigan,* 133 S.Ct. 1069, 1074-75 (2013) (citations omitted).

For several reasons, we disagree that the trial judge's initial comments were an acquittal on the State's section 7.02(a)(2) theory of party liability. First, in the context of Falk's argument on his original motion for directed verdict, the trial court never ruled, explicitly or otherwise, that the motion was granted on the State's section 7.02(a)(2) theory of party liability. *Cf. Ex parte Crenshaw,* 25 S.W.3d 761, 763 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (trial court granted defense motion for directed verdict on State's .10 theory of DWI). Rather, the record reflects continuing debate and argument on that theory *after* the trial judge's initial comments without a ruling. That the trial judge never granted a directed verdict for Falk on the State's section 7.02(a)(2) theory of party liability is reflected by Falk's filing a post-mandamus written motion for directed verdict that sought a partial directed verdict on the State's section 7.02(a)(2) theory of party liability.[3] The trial judge indisputably denied that motion in its entirety.

Finally, we agree with the State that the trial judge's actions—his initial comments that he did not "see any evidence" to support a section 7.02(a)(2) jury instruction and his overruling the State's objection to the proposed charge's exclusion of an instruction under section 7.02(a)(2)—lacked the finality necessary to constitute an

---

[3] That the trial judge did not rule is also reflected by Falk's statement to the trial judge when proceedings reconvened on January 25: "[W]e had numerous issues before the Court on a directed verdict that were not ruled on. And the Judge said he would rule on them the next day and they were never ruled on and it's our duty to make sure they get ruled on." The trial judge agreed, stating: "I did tell you I would let you know at 8:30 in the morning and 8:35 I received notice of the stay."

acquittal on the State's section 7.02(a)(2) theory of party liability because there was no final decision by the trial judge on the charge. *See Blueford v. Arkansas*, 132 S.Ct. 2044, 2050-51 (2012) (after jury foreperson reported jury had unanimously voted against capital and first-degree murder but was told to continue deliberating on other charges, defendant could be retried after mistrial because jury's continued deliberations deprived report of necessary finality); *cf. Crenshaw*, 25 S.W.3d at 766-67 (holding that, while trial court's *directed verdict* on "theory" of criminal liability was not cognizable, State could not retry defendant on that theory because trial court took theory from jury and it was "conceptually similar to an acquittal"). The trial judge could "revisit" his preliminary decision. *See Blueford*, 132 S.Ct. at 2051 (noting that it was possible for jury to revisit its prior vote because deliberations continued).

The proposed charge was necessarily tentative; it "was not a final resolution of anything." *Id.* at 2050. We agree with the State that the parties had no expectation of finality with the proposed charge until the trial judge actually read the charge "as finally written" (TEX. CODE CRIM. PROC. ANN. art. 36.16 (West 2006)); the proposed charge was subject to further objections by the parties and reconsideration by the trial judge. *See id.* ("After the judge shall have received the objections to his main charge, together with any special charges offered, *he may make such changes in his main charge as he may deem proper*, and the defendant or his counsel shall have the opportunity to present their objections thereto and in the same manner as is provided in Article 36.15, and thereupon the judge shall read his charge to the jury *as finally written*") (emphases added). It is notable that, after we had ruled on the State's mandamus petition but

before the Court of Criminal Appeals had ruled, Falk and the trial judge (who was represented by his own counsel in the two mandamus proceedings) contended in the Court of Criminal Appeals "that the State now has an adequate remedy at law because Judge Keeling has agreed to reconsider his rulings [on the charge]."[4] *Weeks II*, 391 S.W.3d at 123.

In conclusion, because the trial judge's initial comments and proposed charge were not an acquittal or a final resolution of the charge issue on the State's section 7.02(a)(2) theory of party liability, we overrule issue two.

## Due Process and Separation of Powers

In issue three, Falk alleges that the mistrial caused by the two mandamus proceedings initiated by the State deprived Falk of due process and due course of law and access under the open courts provision. In issue four, Falk contends that the exercise of mandamus jurisdiction by the Court of Criminal Appeals violated the separation of powers of the Texas Constitution and also violated state and federal guarantees of due process, equal protection, and open courts.

The State, citing *Ex parte Weise*, 55 S.W.3d 617, 619-20 (Tex. Crim. App. 2001), responds that these claims are not cognizable in a pretrial habeas application and that they are better addressed in a postconviction appeal. We agree, and Falk cites no authority that supports the propriety of these claims in a pretrial habeas setting.

---

[4] In his "Response to State's Motion for Leave to File Petition for Writ of Mandamus and Prohibition," Falk noted that, after we had issued our opinion in *Weeks I* but before the State sought mandamus in the Court of Criminal Appeals, the State had filed a "Motion to Reconsider Court's Charge." That motion requested the trial judge to reconsider the proposed charge in light of our opinion and specifically requested the trial judge to instruct the jury on section 7.02(a)(2).

Furthermore, we decline to create a new basis for pretrial habeas relief premised on the State's successful mandamus proceeding in the Court of Criminal Appeals. Issues three and four are overruled.

## Conclusion

Having overruled all of Falk's issues, we affirm the trial court's order denying Falk's application for writ of habeas corpus and special plea in bar.

REX D. DAVIS
Justice

Before Justice Davis,
 Justice Lang,[5] and
 Justice Scoggins
Affirmed
Opinion delivered and filed July 24, 2014
Publish
[CRPM]

---

[5] The Honorable Douglas S. Lang, Justice of the Fifth Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 74.003(a) (West 2005).