

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00002-CR

_____

EX PARTE CHARLES RAINES

On Appeal from the 85th District Court
Brazos County, Texas
Trial Court No. 19-03987-CRF-85

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

After one day of testimony in August 2020, the State had rested its Brazos County[1] case against Charles Raines for continuous violence against the family.[2]  The next morning, the trial court had learned that Raines had been in close contact with a person who had been diagnosed with COVID-19, and after a short hearing and over Raines's objection, the trial court *sua sponte* declared a mistrial.

Before his second trial, Raines filed an application for a writ of habeas corpus (the Application) asserting that a re-trial was barred by his right against double jeopardy.  After an evidentiary hearing, the trial court denied the Application.

On appeal, Raines complains that there was no manifest necessity that justified a mistrial because the COVID-19 exposure resulted from judicial and law enforcement disregard of their own COVID-19 risk avoidance protocols and because the trial court did not reasonably rule out the less drastic alternative of a fourteen-day continuance.  Because (1) the mistrial declaration is entitled to great deference and (2) the trial court's manifest-necessity determination was not an abuse of discretion, we affirm the denial of Raines's application for a writ of habeas corpus.

---

[1]Originally appealed to the Tenth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts.  *See* TEX. GOV'T CODE ANN. § 73.001.  We are unaware of any conflict between precedent of the Tenth Court of Appeals and that of this Court on any relevant issue.  *See* TEX. R. APP. P. 41.3.

[2]*See* TEX. PENAL CODE ANN. § 25.11(a).

After the Office of Court Administration approved a COVID-19 safety plan for holding jury trials developed by the Brazos County district courts (the Brazos COVID-19 Plan),[3] the trial court and the 361st Judicial District Court of Brazos County both held criminal jury trials that began on August 17, 2020. The courts held jury selection in separate locations away from the courthouse on August 17 and began testimony in their separate courtrooms on August 18. The defendant in the 361st Judicial District Court was Teron Pratt, and Raines was the defendant in the 85th Judicial District Court. Both Pratt and Raines were incarcerated in the Brazos County Jail, which is located about one mile from the courthouse.

In the Pratt trial, testimony was concluded on the morning of August 18, arguments were concluded that afternoon, and the jury members deliberated until they were sent home for the

---

[3]The Honorable Steve Smith, judge of the 361st Judicial District Court and administrative judge for Brazos County, testified that the Office of Court Administration (OCA) permitted the Brazos County courts to hold in-person jury trials as long as they followed the Brazos COVID-19 Plan and did the "other things [OCA] outlined." Although it is unclear what the "other things OCA outlined" were, Raines introduced an OCA document entitled "Guidance for All Court Proceeding During COVID-19 Pandemic (For Proceedings on or after June 1, 2020) (OCA Guidance). The OCA Guidance required that, before holding non-essential in-person proceedings, the administrative district judge, in consultation with other judges and the local health authority, must develop and have approved an operating plan that contained the protocols for safely holding in-person proceedings during the COVID-19 pandemic. Among other components, the OCA Guidance required the operating plan to include the following screening requirement:

> **Screening - how the courts will ensure screening of all individuals entering the courthouse or courtroom areas**
>
> Individuals feeling feverish or with measured temperatures equal to or greater than 100.0°F, or with new or worsening signs or symptoms of COVID-19 such as cough, shortness of breath or difficulty breathing, chills, repeated shaking with chills, muscle pain, headache, sore throat, loss of taste or smell, diarrhea, or having known close contact with a person who is confirmed to have COVID-19 must not be permitted entry.
>
> Special attention should be given to how inmates or detainees from jail and juvenile facilities who may be transported to a courtroom will be screened, including consideration of a lower threshold temperature of 99.6°F as an indicator of symptoms.

(Footnotes omitted). There was no evidence that the Brazos County courts did not screen the participants in the trials taking place on August 17 and 18 as required by the OCA Guidelines.

evening at 5:00 p.m. In this case, the State called ten witnesses against Raines and then rested its case.

That night, Judge Smith was informed by Sergeant Doug Chambers, the jail transportation sergeant, that Pratt had tested positive for COVID-19. The next morning, Judge Smith informed Judge Hawthorne, the judge in this case, that Pratt had tested positive for COVID-19 and that, on August 18, Pratt and Raines had been transported in the same vehicle between the jail and the courthouse. The trial court also learned that Pratt had tested positive for COVID-19 on August 10.

Later the morning of August 19, the trial court addressed the situation in open court with Raines, Raines's attorney, and the district attorney. The trial court expressed its concern that, because Raines had been transported with Pratt, there was a potential exposure to Raines, his attorneys, the court bailiff, the court coordinator, and, because the bailiff escorted the jurors between the jury room and the courtroom, the jury. The trial court also acknowledged that, contrary to guidelines of the Centers for Disease Control and Prevention, the state health department, and the Brazos COVID-19 Plan, Pratt had not been quarantined. Finally, the trial court recounted its contact with David Slayton, the administrative director of the OCA, who informed the trial court that anybody who had a potential exposure to COVID-19 would have to be quarantined and tested. The following exchange ensued:

> THE COURT: So, that puts us at the very least of continuing this trial for at least 14 days and that's if nobody comes back and tests positive. So we're assuming that we may be able to continue in 14 days assuming nobody -- everybody clears.

4

This Court's got concerns about informing the jury that they have a potential event related to COVID. One of the first questions I asked them on voir dire was whether -- what their comfort level -- if they were concerned just by the mere fact that they were being called as potential jurors during this time period that we're going through with all the Governor's mandates and -- related to COVID-19 under his emergency orders; all the OCA's orders related to the situation the courts have been in; and the general public about dealing with COVID-19 that could materially affect their decision-making process one way or the other, good or bad for both sides; and whether their decision would be based on the facts that are presented in the case versus the surrounding circumstances that they're having to make this decision under. Obviously, that's speculation on my part; but having been a trial attorney for 28 years and a judge for 6 and given the nature of their responses during jury selection, I don't think there's any guarantee that either side receives a fair trial because of the information that they would get related to what we're exposed to at this particular point in time.

Comments from the State?

[The State]: Judge, I'd like to ask in addition to that for the record to reflect that during my voir dire the first -- one of the first questions I asked was, "How many people here are uncomfortable just being in a group of other individuals"; that around -- between one third and one half of the panel raised their hands indicating that they were uncomfortable being in a room, that we repeatedly assured them of their safety and the protocols that we would take in regards to their safety -- the preparations we were making and the assurances that we would make.

I would ask the record to reflect that when you asked whether or not they were comfortable with us removing masks or us talking to them without masks, a good percentage of the -- the venire panel indicated they were uncomfortable with us removing masks even 6 feet social distancing or -- because of the nature of the Corona virus, and that they continued to approach Mr. Tyler throughout the trial and the venire process concerned about safety with the ongoing global pandemic.

We would ask you to find based on their responses and their answers to questions in voir dire that granting a mistrial in this case over the defendant's objection is manifestly necessary, that there is no other lesser measures including a continuance that could assure both the State and the Defense a fair trial and thus it is necessary to grant one and that it's at no fault of the prosecution of the State of Texas that this mistrial is granted.

THE COURT: If I grant a mistrial, it's nobody's fault. I'll find that for the record. I don't think it's either side's fault -- not related to this courtroom. I'll put

5

it to you that way. And I don't specifically recall your questions on voir dire without going back to look at the record. I do recall that there was -- there was concern -- deep -- I don't know if I would qualify it as deep concern; but there was specific concern about just the mere fact they were there and the effect of the environment COVID-19 that we were working under, by the jurors. I think I expressed that.

Mr. Turnbull?

[Defense Attorney]: Judge, just simply the State has known -- they can try and separate themselves from the Sheriff's Department if they want to, but they're all one entity. They have known for seven days I think at least that -- that Mr. Pratt, the other defendant, was positive; and the Court -- there are less restrictive means that the Court could take to take care of this.

THE COURT: What are those?

[Defense Attorney]: We object.

THE COURT: What are those?

[Defense Attorney]: The Court -- that's up to the Court for what those are.

THE COURT: Well, give me some suggestions. I'm looking for some suggestions.

[Defense Attorney]: Well, it's not my place to do so, Judge. It's the Court's place to make those decisions. It's the Court's decision and the Court's making the decision, but we object to it obviously.

THE COURT: Well, I will put on the record -- and I've held off talking to the judge -- I mean, talking to the Sheriff's Department because I don't think I'm in a proper place to be talking to them about it right now. But I'll note for the record that we were not told about this until this morning, the other court was not told about it until last night; that's at least eight days from the testing of -- positive test out at our jail and a person is being transported while they're supposed to be in quarantine. That's the facts that I know as of right now . . . .

[The State]: And, Judge, just as an officer of the Court -- and you recognize that you were the ones that informed the prosecution -- of the State of Texas about this testing result, that we did not have any prior knowledge or prior information about any inmate that had tested positive or were supposed to be quarantined.

THE COURT: If I didn't make that clear – I immediately told y'all about 8:15 this morning, and that was -- y'all didn't know anything about it -- neither side knew anything about it at that time.

Anything else, Mr. Turnbull? . . .

[Defense Attorney]: Yes, sir . . . . Just to reurge to the Court that there are less restrictive means that the Court could take under the circumstances. Those are, of course, the decision of the Court but there are and we object to the mistrial. State has known that this was going on for over a week and told none of us, as you've said on the record.

THE COURT: I've run through every scenario you can think of of a manner that I could take less drastic actions than considering a mistrial, and I can't think of what it is. Take a smarter person than me, I guess, at this particular point in time.

Anything else from anybody?

[The State]: Just that you find that the mistrial is of manifest necessity.

THE COURT: All right. Based on everything that I've said, Court's going to find that --

[Defense Attorney]: Well, Judge, obviously we disagree with the Court. There are less restrictive means that could be taken by the Court. There are a bunch of them, and they should be taken.

THE COURT: Okay.

[Defense Attorney]: And we object to the mistrial.

[The State]: And that that manifest necessity is due to the Corona virus and the global pandemic.

THE COURT: Based on all the reasons that I've stated on the record here, I believe the circumstances render it impossible to provide a fair verdict.

[The State]: And we're not a party to that, Judge -- the prosecution.

THE COURT: Based on what I know today I'm going to say that's the situation, neither party knew anything about it.

7

Now, how it may fall out from the fact that the jail seems to be the issue here, I don't know what -- what's going on in the background associated with that so . . . But I'm going to find it's impossible to continue with the trial and declare a mistrial.

The jury was then brought in and after informing the jury that a material participant in the trial had a potential exposure to COVID-19 and that he had declared a mistrial, the court explained his reasons:

[T]he very least that I could have done was delay this trial for two weeks and ask y'all to come back at a later date. That's if everything came out negative. If anything -- if anybody tested positive or anything like that, I don't know when we would continue the trial.

Also at the very least -- even if didn't have to quarantine -- and y'all don't need to quarantine from what I've been told. Even if they didn't quarantine, we would have to test the individual -- the person has not been tested and would be two to five days before we got any results back. So be at least two to five days from being able to come back and continue the trial.

Just the mere fact -- I would have had to tell you -- even if I said, "okay. I'm going to tell the jurors and we're going to go forward," based on y'all's responses at voir dire I got the impression that most of the panel was uncomfortable being called as jurors just by the mere fact that we're in this environment. I mean, most people shook their head affirmatively when I asked the question -- if I remember correctly. [The State] asked the question and same response was, "yeah, I'm uncomfortable being here" blah, blah, blah.

So, based on that I declared a mistrial because I think even after I tell y'all whether you would have been making your decision, consciously or unconsciously, based on the facts or "I want to get out of here. I'm going to find him guilty, not guilty --"whatever it may have been would not have been a decision strictly on the facts of the case which is what you're required to do. And I was unwilling to put y'all in that position. I don't think it would have been fair to the State, I don't think it would have been fair to the defendant. So for that reason I declared a mistrial.

At the hearing on the Application, Judge Smith testified that he did not know that Pratt had been in the COVID isolation unit at the jail before the Pratt trial began. He also believed that none of

8

his staff knew before the trial began. Patrick Massey, the bailiff for the 361st Judicial District Court, testified that he believed he learned that Pratt was in the isolation unit the Friday before trial, on August 14. Massey also believed he mentioned to Judge Smith as he was walking through the office that Pratt was in a unit with positive people and that he needed to be tested..

Steve Tyler, the bailiff in this case, testified regarding the arrangement of the courtroom during Raines's trial and the social distancing and other precautions that were taken. He testified that Raines was seated twenty feet from the nearest juror and that he had worn a mask. Tyler also testified that he wore a mask at all times, including when he was in contact with jurors. He was in close proximity to Raines five or six times that day and wore a mask each time. Tyler agreed that a few of the jurors were skittish about COVID-19, that at least one juror expressed concerns about the court reporter not wearing a mask, and that one or more jurors expressed concerns about him not wearing his mask over his nose. He also agreed that the attorneys, jurors, and witnesses in the Pratt case and this case would all have to share the same bathrooms, elevator, and stairwells.

Kit Wright, the medical sergeant at the jail, testified that inmates exposed to someone who had tested positive for COVID-19 were quarantined for fourteen days and that they were not released from quarantine until they had been symptom-free for seventy-two hours. She also testified that Pratt was symptomatic on August 9, tested positive on Aug 10, and under the jail protocols, should have been quarantined for at least fourteen days. Wright testified that Pratt tested positive again on August 19. She also testified that Raines tested positive for COVID-19 on August 19 and opined that he was probably exposed to COVID-19 four or five days before the

9

19th. She stated that Raines would have to be isolated for at least fourteen days. After taking the case under advisement, the trial court denied the Application.

"Generally a criminal defendant may not be put in jeopardy by the State twice for the same offense."[4] *Pierson v. State*, 426 S.W.3d 763, 769 (Tex. Crim. App. 2014) (citing U.S. CONST. amend. V; *Hill v. State*, 90 S.W.3d 308, 313 (Tex. Crim. App. 2002)). "In cases tried before a jury, a defendant is placed in jeopardy when the jury is empaneled and sworn, and 'because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendant's "valued right to have his trial completed by a particular tribunal."'" *Id.* (quoting *Arizona v. Washington*, 434 U.S. 497, 504 (1978) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949))). However, "there are two exceptions when a criminal defendant may be tried a second time without violating double-jeopardy principles if the prosecution ends prematurely as the result of a mistrial: (1) if the criminal defendant consents to retrial or (2) there was a manifest necessity to grant a mistrial." *Id.* at 769–70 (citing *Ex parte Garza*, 337 S.W.3d 903, 909 (Tex. Crim. App. 2011)). "These exceptions are recognized because valid reasons exist for a jury to be discharged before the conclusion of a trial and not all of those reasons 'invariably create unfairness to the accused[.]'" *Id.* at 770 (quoting *Washington*, 434 U.S. at 505). Consequently, "a defendant's right to have his trial conducted by a particular tribunal 'is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury.'" *Id.* (quoting *Washington*, 434 U.S. at 505).

---

[4]The Fourteenth Amendment to the United States Constitution extends the prohibition on double jeopardy to the states. *Id.* (citing *Benton v. Maryland*, 395 U.S. 784 (1969)).

10

"To prevail in a double-jeopardy claim, a criminal defendant must first show that he or she is being tried for the same offense for which the mistrial was declared over the defendant's objection." *Id.* "The burden then shifts to the State to demonstrate a 'manifest necessity' (also referred to as a 'high degree' of necessity) for the mistrial. A trial court's decision to declare a mistrial is limited to the inquiry of if there was a 'manifest necessity' to grant a mistrial." *Id.* (citing *Garza*, 337 S.W.3d at 909). Manifest necessity exists when the circumstances giving rise to the mistrial "(1) render it impossible to arrive at a fair verdict before the initial tribunal, (2) render it impossible to continue the trial, or (3) involve trial error that would trigger an automatic reversal on appeal if a verdict was returned." *Ex parte Falk*, 449 S.W.3d 500, 505 (Tex. App.—Waco 2014, pet. ref'd) (citing *Garza*, 337 S.W.3d at 909). A trial court abuses its discretion "whenever the trial court declares a mistrial without first considering the availability of less drastic alternatives and reasonably ruling them out." *Garza*, 337 S.W.3d at 909. However, "[t]he trial court need not expressly articulate the basis for the mistrial on the record in order to justify it to a reviewing court, so long as manifest necessity is apparent from the record. *Id.* at 909–10 (citing *Washington*, 434 U.S. at 516–17).

A trial court's denial of an application for a writ of habeas corpus is reviewed for an abuse of discretion. *Falk*, 449 S.W.3d at 503 (citing *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006)). "We review 'the record evidence in the light most favorable to the trial court's ruling and [we] must uphold that ruling absent an abuse of discretion.'" *Id.* (quoting *Kniatt*, 206 S.W.3d at 664). To be an abuse of discretion, the trial court's decision must be outside the zone of

11

reasonable disagreement. *George v. State*, 41 S.W.3d 241, 243 (Tex. App.—Waco 2001, pet. ref'd).

Nevertheless, our review of a decision to grant or deny double jeopardy relief is not static, and it varies depending on the cause of the mistrial. *Id.* at 503–04 (citing *Ex parte Rodriguez*, 366 S.W.3d 291, 296 (Tex. App.—Amarillo 2012, pet. ref'd) (citing *Washington*, 434 U.S. 497, 507–08)). On one end of the spectrum, great deference is afforded the trial court when a mistrial results from a deadlocked jury. *Arizona v. Washington*, 434 U.S. 497, 510 (1978). On the other end of the spectrum, "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." *Id.* at 508–09. Consequently, "part of our task is to determine the correct standard of review by identifying the cause of the mistrial." *Falk*, 449 S.W.3d at 504 (quoting *Rodriguez*, 366 S.W.3d at 296 (citing *United States v. Fisher*, 624 F.3d 713, 719 (5th Cir. 2010))).

*(1)     The Mistrial Declaration Is Entitled to Great Deference*

In this case, the precipitating event that led to the trial court declaring a mistrial was Raines's close-contact exposure to Pratt, who had previously tested positive for COVID-19. Raines asserts that the cause of his exposure was the Brazos County judiciary's and the Sheriff's Office's disregard of known risks and risk avoidance protocols for COVID-19. Relying on cases in which the State chose a jury and went to trial knowing that a key witness may not be available for trial, Raines argues that, because the judicial and jail officials ignored the known risks and did

12

not follow proper risk avoidance protocols, strict scrutiny is the proper standard of review in this case.

All of the cases applying the strict-scrutiny standard of review cited by Raines involve prosecutors who (1) assumed known risks of something within their control, i.e., ensuring that an essential witness would be available and present at trial when the case went to trial, and (2) subjected the defendant to jeopardy.[5] In those cases, the defendant's "valued right to have his trial completed by a particular tribunal"[6] is frustrated by a mistrial, and a mistrial gives "the prosecutor a more favorable opportunity to convict." *Downum*, 372 U.S. at 736 (citing *Gori v. United States*, 367 U.S. 364, 369 (1961)). In addition, "'where "bad-faith conduct by judge or prosecutor" . . . threatens the "[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict" the defendant,'" strict scrutiny would be appropriate. *Washington*, 434 U.S. at 508 (quoting *United States v. Dinitz*, 424 U.S. 600, 611 (1976) (quoting *United States v. Jorn*, 400 U.S. 470, 485 (1971) (plurality op.); *Downum*, 372 U.S. at 736)). However, neither the United States Supreme Court nor the Texas

---

[5]*See Downum v. United States*, 372 U.S. 734, 735–36 (1963) (jeopardy attached when prosecution let a jury be chosen and sworn even though prosecutor knew a key witness was not present and had not been subpoenaed); *Walck v. Edmondson*, 472 F.3d 1227, 1239 (10th Cir. 2007) (jeopardy attached when prosecutor let jury be chosen and sworn knowing that key witness would not be available for trial); *McClendon v. State*, 583 S.W.2d 777, 778–79 (Tex. Crim. App. 1979) (in bench trial, jeopardy attached when State allowed defendant to plead guilty and went to trial without making any attempt to secure the presence of a key witness).

[6]*Washington*, 434 U.S. at 503 (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)).

Court of Criminal Appeals has held that a mistrial caused by anything less than bad-faith conduct by a judge would be subject to strict scrutiny.[7]

Raines contends that the judiciary and jail personnel ignored their own protocols when Raines was transported with Pratt between the jail and the courthouse, but he does not contend, and the record does not show, that any judiciary or jail personnel acted in bad faith. The record does show that at least one jail worker failed to follow the jail protocols when Pratt was removed from isolation and transported to the courthouse, even though he had tested positive for COVID-19 seven or eight days earlier. Nevertheless, while this may show that the jail personnel acted negligently, it does not show the jail employee acted in bad faith.

Raines also faults both Judge Smith and Judge Hawthorne for not following the OCA Guidelines by allowing Pratt to be removed from the isolation tank and by not testing Pratt and Raines for COVID-19 immediately before trial. However, the OCA Guidelines in effect at the time of trial did not require the judiciary to oversee jail practices and did not require detainees to be tested for COVID-19 prior to trial. Rather, the OCA Guidelines required only that individuals be screened so that persons, including detainees, feeling feverish or with measured temperatures equal to or greater than 100.0°F, with the then-known signs or symptoms of COVID-19, or having known close contact with a person who was confirmed to have COVID-19, not be allowed in the courtroom. There is no evidence in the record that Raines or Pratt exhibited any symptoms of COVID-19 on August 17 or 18 or that they were not appropriately screened.

---

[7]Raines does not cite, and we have not found, any reported cases in which a mistrial was caused by the conduct of law enforcement officers or jail personnel based on their actions transporting or implementing health and safety procedures for inmates outside the presence of the jury. Additionally, we do not believe courts of last resort would apply a strict scrutiny standard of review in such circumstances unless, at a minimum, the conduct was intentional or in bad faith.

14

Although Raines asserts that Judge Smith, the local administrative judge, and his personnel knew that Pratt was housed in the COVID-19 isolation pod before the trials began, the record establishes only that Judge Smith's bailiff knew that information. Although the bailiff testified that he mentioned this fact as Judge Smith walked through the office, Judge Smith testified that he did not learn that Pratt was in the isolation tank or that he was positive for COVID-19 until the night of August 18. In a bench trial, "the trial court is the 'exclusive judge of the credibility of the witnesses and the weight to be given to their testimony.'" *Deckard v. State*, 953 S.W.2d 541, 543 (Tex. App.—Waco 1997, pet. ref'd) (quoting *Joseph v. State*, 897 S.W.2d 374, 376 (Tex. Crim. App. 1995)). Consequently, the trial court was free to believe Judge Smith's testimony and discount the bailiff's recollection.

The record in this case does not support Raines's contention that the conduct of judiciary personnel caused the mistrial. The record also does not establish that the mistrial was caused by the bad-faith conduct of jail personnel. Rather, the record shows that, although the Brazos County courts had approved COVID-19 protocols in place, an event unanticipated by those protocols, i.e., the transportation of a COVID-19-positive detainee with the defendant, precipitated the mistrial. Under this record, we find that the trial court's decision to grant a mistrial is entitled to great deference by this Court. *See Washington*, 434 U.S. at 510. We overrule this issue.

*(2)*   *The Trial Court's Manifest-Necessity Determination Was Not an Abuse of Discretion*

Raines also contends that no manifest necessity existed, since a continuance of fourteen days was possible. Raines argues that the trial court did not adequately consider and rule out a continuance and faults the trial court for assuming that a number of the jurors would be too upset

15

with the knowledge of their possible exposure to COVID-19 to be able to render a fair verdict. He argues that the trial court should have inquired of the jurors to accurately gauge their reactions before it declared a mistrial.

Both parties agree that the trial court should be accorded great deference in our review of the trial court's manifest-necessity ruling. *Pierson*, 426 S.W.3d at 774. As the Texas Court of Criminal Appeals has pointed out, this same deference applies to a trial judge's determination that a less drastic alternative would be insufficient to ensure a fair trial. *See id.* The United States Supreme Court has explained that "[t]here are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance" of the mistrial-precipitating circumstances on the jury:

> He has seen and heard the jurors during their voir dire examination. He is the judge most familiar with the evidence and the background of the case on trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be. *See Wade v. Hunter*, 336 U.S. 684, 687 . . . .

*Washington*, 434 U.S. at 513–14. "In evaluating manifest necessity, a reviewing court must consider the nature of the case, its procedural posture, the cause of the mistrial, the interests of the parties, the availability of less drastic alternatives, and the ends of public justice." *Falk*, 449 S.W.3d at 505.

There are several unique factors in this case that affected the trial court's determination that manifest necessity required a mistrial. First, the trial took place only about six months into the COVID-19 global pandemic that was causing widespread death across the United States and the world and that was not equalled by any such event in over a century. Also, this was one of the

16

first jury trials held in Brazos County and the first held by that trial court since the Texas Supreme Court began allowing jury trials conditioned on the trial court developing a COVID-19 plan in accordance with OCA Guidelines. Those guidelines provided for extraordinary measures to be taken in social distancing, screening of all persons entering the courthouse, hygiene, face coverings, and frequent cleaning of surfaces in and around the courtroom. Nevertheless, the record suggests that the dangers and uncertainties surrounding COVID-19 and what and how courtroom activities could be conducted safely weighed on the minds of all concerned from the outset of the trial.

At the beginning of jury selection, the trial court spent considerable time addressing those concerns by explaining how the COVID-19 protocols instituted by the court came about and describing the protocols. The court also urged the members of the venire panel to notify court personnel if they saw something that concerned them. One of the first questions asked by the State in voir dire was if the venire members were uncomfortable sitting in the room even though they were socially distanced. Out of sixty-one venire members, the record shows that twenty raised their hands and acknowledged their discomfort. Three of the venire members who raised their hands served on Raines's jury. What the record does not reflect, but the trial judge could observe, was any facial expressions or body language of the remaining jurors that could have also indicated unacknowledged discomfort.[8] The record also reflects that at least a few of the jurors selected to

---

[8] The trial court's recollection two days later was that most of the venire members nodded their heads when asked if they were uncomfortable being there.

serve on Raines's jury remained skittish about COVID-19 and expressed concern when they observed some of the court personnel not following the COVID-19 protocols.

On the first day of trial, the State put on ten witnesses before resting its case. When the trial court learned the next morning that Raines had had close contact with Pratt, it contacted OCA and learned that Raines, Raines's attorneys, and the court coordinator would have to quarantine for fourteen days and be tested for COVID-19. It also learned that, if any of those people tested positive, the jury would have to be informed and might have to quarantine. The trial court expressed its concern that any continuance would be at least fourteen days and perhaps more if anyone involved tested positive. It also expressed the concern that, because some of the jurors expressed discomfort at being there before being exposed to COVID-19, once they were informed of their exposure, it could materially affect their decision-making process. It explained that it was concerned that the jury would be unable to render a fair verdict because jurors would be anxious to reach any verdict quickly to get out of the situation as soon as possible, rather than reach a verdict based on the facts of the case. It did not believe that would be fair to either the defendant or the State.

The trial court then asked for comments from the parties. The State argued that, based on the COVID-19 pandemic, the acknowledged discomfort by the jurors during voir dire, and their continued concern regarding courtroom safety, the trial court should find that there was manifest necessity for a mistrial and that no other lesser measures, including a continuance, could assure the State and Raines a fair trial. Raines objected to a mistrial and insisted that there were less restrictive alternatives but did not identify viable alternatives for the trial court. The trial court

18

then found that the circumstances it had discussed made it impossible to obtain a fair verdict and declared a mistrial.

This case is not a case in which the trial court made an arbitrary decision to declare a mistrial without considering less drastic alternatives. *See, e.g.*, *Brown v. State*, 907 S.W.2d 835 (Tex. Crim. App. 1995); *Ex parte Little*, 887 S.W.2d 62, 64 (Tex. Crim. App. 1994); *Harrison v. State*, 788 S.W.2d 18, 21 (Tex. Crim. App. 1990). Rather, this record demonstrates that the trial court carefully considered the feasibility of the less drastic alternative of continuing the case for a minimum of fourteen days, the uncertainty of the length of any continuance,[9] the continued discomfort of at least some of the jurors with participating in a trial during the COVID-19 pandemic and with the trial court's safety protocols, and the impact that informing the jury that one of the participants in the trial had been exposed to COVID-19 would have on their ability to render a fair verdict for both Raines and the State.

Nevertheless, Raines argues that the trial court should have inquired of jurors to accurately gauge their reactions before it declared a mistrial, relying on *Garza*. In *Garza*, a jury was empaneled and sworn in on Monday, August 13, for Garza's trial for misdemeanor driving while intoxicated. The next morning, the trial court announced on the record that one of the jurors had

---

[9]Although every case must be reviewed on its own circumstances, we note that, even in a non-pandemic setting, the Texas Court of Criminal Appeals and other courts have rejected double-jeopardy claims based on a trial court declaring a mistrial resulting from the illness of the defendant or another essential trial participant after the State had begun its case, rather than continuing the case for a week or more. *See Jones v. State*, 187 S.W.2d 400 (Tex. Crim. App. 1945); *see also Loux v. United States*, 389 F.2d 911 (9th Cir. 1968), *cert. denied*, 393 U.S. 867 (1968); *People v. Castro*, 657 P.2d 932 (Colo. 1983), *overruled on other grounds by West v. People*, 341 P.2d 520 (Colo. 2015); *Glover v. United States*, 301 A.2d 219, 222 (D.C. 1973); *State v. Saavedra*, 766 P.2d 298 (N.M. 1988); *Commonwealth v. Thomas*, 498 A.2d 1345 (Pa. Super. Ct. 1985), *app. denied*, 522 A.2d 1105 (Pa. 1987); *State v. Mendoza*, 305 N.W.2d 166 (Wis. Ct. App. 1981). *But see Dunkerley v. Hogan*, 579 F.2d 141 (2nd Cir. 1978).

experienced "a cardiac event" the night before and was hospitalized, then reset the case for two days later, August 16. On August 16, the trial court announced that the ailing juror was still in the hospital as of the afternoon of August 15 and that the earliest he would be available was after August 21. The defendant objected to the State's motion for mistrial and asked for a continuance of a week to allow the ailing juror to recover. The trial court reset the trial for August 22 and instructed its bailiff to contact the other jurors to check on their availability. That same afternoon (August 16), the parties returned to the courtroom for an update, and the bailiff reported that the ailing juror would not be available until after August 21, that two of the other jurors would be available, that one of the jurors would not be available August 21 or 22 because of a business trip, and that he had been unable to reach the remaining two jurors. *Garza*, 337 S.W.3d at 906–07.

The trial court then told the parties that it had told the jury that the trial would take no more than two days, that it was concerned about keeping the jury through the weekend and beyond Wednesday of the following week, and that, in its experience, when the trial takes longer than expected, there can be problems with the jury's willingness to process information. It also noted the uncertainty of when the ailing juror would be available. The trial court then declared a mistrial and ordered the parties to return on August 22 for jury selection. *Id.* at 907. Garza objected and requested a continuance for one or two weeks or, in the alternative, to proceed with the jurors who were available. The trial court denied the continuance but did not acknowledge Garza's request to proceed to trial with the remaining jurors. *Id.* Before jury selection in the second trial, Garza filed an application for a writ of habeas corpus based on double jeopardy, which the trial court denied. *Id.* at 907–08.

20

In sustaining Garza's double-jeopardy claim, the Texas Court of Criminal Appeals noted that it had not been shown that the trial court had not ruled out the possibility that a one-week continuance could have allowed Garza to obtain a verdict from the original jury or from five members of that jury. *Id.* at 916. The court also faulted the trial court for relying solely on its experience in assuming a delay could affect the jury's attitude and willingness to process information. Noting that "[t]his was not a situation, however, in which a trial had already commenced, and a jury would be expected to retain information over the course of a protracted continuance," the court, at the time the mistrial was declared, "had not . . . determined . . . that a continuance of more than a week was necessary." *Id.* The court went on to note that, rather than relying on its experience, the trial court should have made inquiries of the jury to determine whether such a short delay "would in fact negatively impact their 'attitude' and detract from their ability to 'process information' and otherwise focus on the proceedings." *Id.*

*Garza* is distinguishable on its facts. First, although the jury had been empaneled and sworn, no testimony had been taken. In this case, the State had called ten witnesses and rested its case. Also, in *Garza*, the trial court had not established that any continuance would last more than a week. In this case, the trial court had established that, because of the COVID-19 protocols, a continuance would last a minimum of fourteen days. Consequently, in this case, a continuance would have required the jury to retain information over the course of a protracted period. Further, although Garza agreed to proceed with the remaining five jurors, the trial court failed to even consider that option. In this case, the trial court considered and reasonably eliminated the only less drastic alternative to mistrial. Finally, the *Garza* trial court relied solely on its past experience

21

and assumed what the jury's reaction to a continuance would be. In this case, the trial court did not rely solely on its experience. Rather, it considered the jurors' acknowledged concerns about being in a court proceeding during the COVID-19 pandemic, the jurors' expressed concerns about the court's safety protocols, and the impact that the knowledge that a material participant in the trial had been exposed to COVID-19 would have on the jury.

Raines also argues that the course of Pratt's trial showed that there was no manifest necessity for the mistrial in this case. In Pratt's trial, the evidentiary stage was complete, and the jury had begun deliberations on the first day of trial. After Judge Smith told the attorneys of Pratts COVID-19 status the next morning, they agreed to let the jury continue deliberating. After the jury concluded deliberations and reached a guilty verdict, Judge Smith told them of their possible exposure to COVID-19 and recessed the trial until September 17, when the punishment phase was to be held.

We do not conclude that the Pratt trial has any bearing on whether the trial court in this case abused its discretion in declaring a mistrial. The procedural posture of the Pratt trial at the time it was discovered that Pratt had tested positive for COVID-19 was significantly different, its guilt/innocence phase being almost complete. Since the jury finished its deliberation in the guilt/innocence phase before the recess, it was not required to retain information regarding Pratt's guilt or innocence during a protracted continuance. In addition, there is no evidence in the record that the jurors in the Pratt trial had expressed any concerns about being involved in a court proceeding during the pandemic or that they had expressed any concerns about the court's safety

22

protocols, which were major considerations in this trial court's decision to declare a mistrial in this case.

Based on this record, we cannot say that the trial court's determination that there was manifest necessity to declare a mistrial was outside the zone of reasonable disagreement. *See George*, 41 S.W.3d at 243. Therefore, we find that the trial court did not abuse its discretion in its manifest necessity determination. We overrule this issue.

For the reasons stated, we affirm the trial court's denial of Raines's application for a writ of habeas corpus.


Josh R. Morriss, III
Chief Justice

Date Submitted:     March 24, 2021
Date Decided:       April 21, 2021

Do Not Publish